In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-1508

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

BRYAN J. SEVERSON,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 3:07-cr-00074-bbc-1—**Barbara B. Crabb**, *Chief Judge.*

ARGUED JANUARY 13, 2009—DECIDED JUNE 23, 2009

Before BAUER, POSNER and ROVNER, *Circuit Judges*.

BAUER, *Circuit Judge*. Bryan J. Severson was convicted of 28 various counts of money laundering, bank fraud and bank embezzlement and was sentenced to 140 months' imprisonment. Severson challenges both his conviction and sentence. With regard to his conviction, Severson argues that the government failed to prove his knowledge of illegality on ten counts and that a deliberate avoidance instruction was improperly given to the jury. As to his sentence, Severson argues that

the loss was improperly calculated and that prior misde-
meanors erroneously enhanced his criminal history. For
the following reasons, we affirm Severson's conviction
and sentence.

## I. BACKGROUND

Mark Hardyman was the President of the First National
Bank of Blanchardville, Wisconsin (FNBB). FNBB was
an FDIC insured financial institution, regulated by
the Office of the Comptroller of Currency (OCC). In
May 2003, the OCC conducted a regularly scheduled
examination of the bank. The OCC examiners' review
revealed that there were violations of the bank's legal
lending limit. The bank examiners determined that the
violations pertained to loans that were not being repaid
but were being renewed, giving the impression that the
loans were not in default. The examiners found that the
violations totaled approximately $14,000,000. The OCC
closed the bank's doors.

The FBI investigated FNBB's closing to determine
whether any criminal statutes had been violated. What
this investigation uncovered was a series of rampant
illegalities orchestrated by bank president Hardyman
that, ultimately, had milked the bank dry.

With the bank in financial trouble, Hardyman sought
to mask the bank's dilapidating condition and to present
the illusion of a financially sound bank. For example, his
activities included, but were not limited to, intentionally
misstating information in internal and external reports,

issuing loans without the required Board of Directors approval, renewing uncollectible, non-paid loans, and soliciting bank customers to issue fraudulent checks on essentially non-existent accounts. Severson was a reoccurring figure in this fraud; we discuss only the facts relevant to his appeal.

Severson was the owner of a small tow-truck company who originally financed his business through FNBB. As his business grew, Severson started up other small businesses through similar financing from FNBB. The fact was, however, that Severson was insolvent, consistently overdrawn, and yet he repeatedly received loans from the bank.

To cover up Severson's overdrawn status and help reflect a positive balance on the bank's books, Severson and Hardyman conspired to defraud FNBB by having Severson, through his various companies, issue and deposit checks without sufficient funding into Severson's overdrawn accounts. This scheme proved a cover for Hardyman and Severson: Hardyman's bank hid its true condition and reflected a positive balance; and Severson covered his insolvency and received loans to which he would never have been entitled.

The scheme was hardly subtle. For example, faced with the need to cover Severson's overdrafts from an upcoming scheduled audit, Hardyman and Severson agreed that David Boyington, one of Severson's employees, would write NSF checks for various amounts to Severson. These checks were ultimately deposited and Hardyman told Severson that the checks would be deposited into

Severson's accounts to cover the overdrafts and reflect positive balances.

The overdraft coverup continued. Severson wrote nine NSF checks, drawn on another bank, to cover his overdrafts. At trial, Hardyman identified a summary chart listing multiple NSF checks (totaling $824,019.32), drawn on either Severson's NSF checks or closed accounts at the Bank of Cazenovia, that were deposited into Severson's accounts at FNBB to cover overdrafts.

As part of the scheme, Hardyman also loaned money to the insolvent Severson. For example, Severson desired additional funding to finance the purchase of a limousine for one of his businesses. Because the amount already loaned to Severson had exceeded FNBB's legal limit, Hardyman testified that he loaned $18,500 to Jason Schuepbach, another Severson employee. Hardyman noted that he discussed with Severson why the transaction had to be structured this way and that all parties understood that the loan would be for Severson. Ultimately, Severson took possession of the limousine. Hardyman also testified that Severson would be paying on the loan and no inquiry was made into Schuepbach's ability to pay.

Since this loan, and other loans, were made to insolvent Severson companies, Hardyman covered the fraud by altering quarterly reports, so that Severson's past-due loans would not be reflected. Hardyman also concealed Severson's loans from the FNBB's Board by making changes to monthly Board reports prior to Board meetings. At one point, FNBB transferred some of Severson's

debt to Highland Bank. Hardyman informed Severson that he was selling some loans to Highland. Although Severson supplied a financial statement to FNBB, Hardyman directed Severson to fraudulently amend his financial statements because they could not give Highland accurate statements since they "did not look good from a financial standpoint." Together, they changed Severson's financial statements so that several of Severson's loans could be sold to the participating bank.

NSF checks were also used to make fraudulent payments on Severson's loans with FNBB. Severson made payments on the many loans issued by the bank with NSF checks to avoid past-due status. Hardyman testified that he and Severson agreed that Severson would pay his loans out of his insolvent checking accounts. Again both benefitted; on the one hand, the bank did not have to report Severson's past-due loan to its regulators, as required; and, on the other hand, Severson received more money than his credit allowed.

In January 2003, at the peak of Hardyman and Severson's conspiracy, Severson received an unsecured one million dollar loan from FNBB for the purchase of a racetrack while his accounts were all overdrawn. The loan was later secured in May 2003 by a mortgage, prior to an upcoming audit. OCC examiner Michael Wills testified that this loan had no viable source of repayment as the Severson companies that received the loans were insolvent.

Overall, the gross amount loaned to Severson was approximately $8.7 million. This amount can be generally put into two categories: (1) approximately $6.6 million as

proceeds attributable to Severson, which were either money directly loaned or money used to coverup overdrafts; and (2) approximately $2.1 million as renewed loans.

The grand jury returned a 28-count superseding indictment against Severson for his participation in the collapse of FNBB. The indictment charged various counts of bank fraud, bank embezzlement, and money laundering. Severson was found guilty on all counts.

During sentencing, the government argued that the overall loss should be the intended loss, excluding any collateral presented by Severson. Severson argued that the money eventually received from the sale of the later-pledged mortgage on the racetrack loan should be applied as collateral to reduce the intended loss. The district court found that the loss amount would be the full amount of the intended loss ($7,136,461.29); it also determined that no credit would be given for any amount received from the racetrack's sale.

Ultimately, the district court found that Severson had a total offense level of 33, with four criminal history points, and a criminal history category of III. This history included one point for prior misdemeanor convictions. The Sentencing Guidelines ranged from 168 to 210 months; the district court sentenced Severson to 140 months' imprisonment.

This timely appeal followed.

## II. DISCUSSION

Severson mounts two attacks on his conviction. He first argues that the government failed to present sufficient evidence of his knowledge of illegality at the time he received three certain loans. Severson also argues that the district court erred by including a "deliberate avoidance" or "ostrich" jury instruction, which allowed the jury to infer that Severson knew of Hardyman's fraud when he received the loans.

Severson pursues another two-pronged attack on his sentence. He argues that the district court miscalculated the amount at issue when it refused to consider collateral later pledged as security on a loan and that the district court improperly calculated his criminal history level by including prior misdemeanor offenses.

### A. Conviction

Severson challenges only 10 counts of his conviction, which all stem from three particular loans made to Severson. Severson argues that the government failed to present sufficient evidence that at the time he received the loans, he was aware that Hardyman had defrauded the bank's directors by not seeking their approval.

A defendant challenging the sufficiency of the evidence must show that "after viewing the evidence in the light most favorable to the prosecution," no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *United States v. Farris*, 532 F.3d 615, 618 (7th Cir. 2008) (internal citations omitted).

Moreover, "we will overturn a conviction based on insufficient evidence only if the record is devoid of evidence from which a reasonable jury could find guilt beyond a reasonable doubt." *Id*. In this inquiry, we do not weigh the evidence or second-guess the jury's credibility determinations. *United States v. Stevens*, 453 F.3d 963, 965 (7th Cir. 2006).

The 10 appealed counts share a common element. Counts 9, 10, and 11, which charged bank fraud, required the government to prove that Severson knowingly aided and abetted Hardyman in his scheme with the intent to defraud. 18 U.S.C. § 1344(1) & (2). The second set of counts (counts 18, 19, and 21) charged Severson with bank embezzlement. 18 U.S.C. § 656. These three counts required proof that Severson knowingly aided and abetted Hardyman's willful misapplication of bank money. The last counts (counts 22, 23, 26, and 27) charged Severson with illegal money laundering. 18 U.S.C. § 1957. These laundering counts required that Severson knowingly aided and abetted Hardyman's unlawful monetary transactions. Severson's appeal claims that the common element of knowledge was not sufficiently proved.

The details of each loan that led to these counts are irrelevant because the challenge to each count is the same: namely, Severson did not knowingly engage in a criminal scheme with Hardyman when he accepted the loans. He specifically argues, with great emphasis, that the government did not present sufficient evidence to show that when he received each of the three loans, he

was aware that the bank's Board had not approved the loans and that Hardyman was defrauding the bank.

We do not understand why Severson places such significance on whether the Board had approved the loans. The Board's knowledge of the illegal loans is not the issue. The critical issue is Severson's knowledge and whether he knew he did not have any funds in his accounts that would have entitled him to those loans.

If we look at the record, there is no dispute that Severson knew he was insolvent. Severson knew his corporate accounts were continuously overdrawn. At trial, Hardyman testified that he had discussed with Severson that Severson would deposit NSF checks to cover his overdrafts. FBI Special Agent Welshinger also testified that Severson, after the bank was closed, mentioned that he knew he operated his accounts in an overdrawn status. Severson, in short, knew he was broke.

Moreover, Severson concedes that he wrote, and had others write, NSF checks to cover his insolvency, creating the appearance that he had funds. Hardyman testified that Severson did this at his request and, during the criminal investigation, Hardyman stated that Severson knew the bad checks were "worthless." Severson, who only reflected a positive account balance by fraud, kept receiving loans that could never have been legitimately repaid. This covered his own insolvency, and covered Hardyman's fraud. Hardyman stated that he would credit Severson's loan payment, even if the check was written on an overdraft account, to prevent the loans from being classified as past-due.

In viewing these facts favorably for the government, there was enough evidence presented that could lead a rational trier of fact to find that Severson had an intent to defraud the bank when he received the three fraudulent loans that led to his conviction.

Actually, the jury did not have to determine that Severson, in receiving the loans, had an intent to defraud. All the jury had to find was that Severson knowingly participated in a scheme: that he knew he was helping Hardyman circumvent the bank's rules and federal law; and that he knew he was covering his own insolvency by his involvement. There is enough evidence in the record to support the jury's decision.

Severson portrayed himself as being naive on these three loans. Although Severson acknowledges that all of his other dealings with Hardyman were knowingly illegal, he suggests that for these three transactions, he merely followed Hardyman's instructions without any idea that Hardyman was behaving fraudulently. However, this is why the district court gave the ostrich instruction. The instruction, which explains to the jury that guilty knowledge also includes the deliberate avoidance of knowledge, is appropriate when: (1) the defendant claims a lack of guilty knowledge; and (2) the facts and evidence support an inference of deliberate ignorance. *United States v. Carrillo*, 269 F.3d 761, 769 (7th Cir. 2001). Deliberate avoidance is not a standard less than knowledge; it is simply another way that knowledge may be proven. *United States v. Carani*, 492 F.3d 867, 873 (7th Cir. 2007) (citations omitted). We review the district court's

decision to give the instruction for an abuse of discretion and, viewing the evidence in the light most favorable to the government, *id.*, we find no such abuse.

Looking at what Severson knew, the instruction was proper. From the beginning of the scheme, Hardyman informed Severson that he was over the legal lending limit, which prompted one of Severson's loans to be put in Schuepbach's name. Severson routinely kited checks; Severson, at Hardyman's request, deposited NSF checks (totaling $824,019.32) drawn on his account from another bank to cover his overdraft. Severson solicited one of his employees to write and deposit NSF checks into Severson's accounts. Moreover, without any money, and knowing that his loans were already over the legal lending limit, Severson received approximately $8,744,019.62 in loans from the bank and paid them off with NSF checks.

With these facts properly supporting the inference of knowledge, the district court's instruction was not an abuse of discretion.

## B. Sentence

The district court applied various enhancements in computing the Advisory range under the 2007 Sentencing Guidelines; one was a 20 level offense enhancement because Severson's conduct culminated in a loss of more than $7,000,000. *See* USSG § 2B1.1(b)(1). Severson claims that the district court erred when it miscalculated the intended loss by refusing to subtract the sale amount of later-pledged collateral on his racetrack loan.

We review the district court's interpretation and application of the Sentencing Guidelines de novo and its factual findings for clear error. *United States v. Hernandez*, 544 F.3d 743, 746 (7th Cir. 2008). "A finding of fact is clearly erroneous only if, based upon the entire record, we are left with the definite and firm conviction that a mistake has been committed." *Carani*, 492 F.3d at 875 (internal citations and quotations omitted).

In determining "Loss," we consider the greater of the actual or intended loss. *United States v. Brownell*, 495 F.3d 459, 461 (7th Cir. 2007); *see also* USSG § 2B1.1, Application Note 3(A). Because the intended loss is greater in our case, we look to Application Note 3(A)(ii) which defines "intended loss" as (I) "the pecuniary harm that was intended to result from the offense"; which includes the (II) "intended pecuniary harm that would have been impossible or unlikely to occur." At sentencing, the government argued that the loss attributed to Severson totaled $7,136,461. Severson countered that this amount should have been reduced by the value of the later-pledged mortgage taken out on the million dollar race-track loan. After FNBB closed, the FDIC sold the race-track note to a third party for $707,293.93. As a credit against the loss, Severson argued that the loss should be reduced by the amount of the pledged collateral recovered. *See* USSG § 2B1.1, Application Note E (where collateral has been pledged, loss reduced by the amount recovered at the time of sentencing from disposition of the collateral). This, he argued, would result in the loss totaling $6,429,167.07, enabling only an offense level enhancement of 18.

The district court rejected Severson's argument because it found that in January 2003, Severson received an unsecured loan for a million dollars with no possibility of repayment; it determined that the intended loss totaled $7,136,461 and increased Severson's offense level by 20.

On appeal, Severson repeats his argument and specifically argues that for his intended loss, we should not look at the time the loan was received, but at the time the fraud was uncovered. If we follow his argument, Severson did not intend to keep the entire loan because four months after he received the entire amount, he pledged collateral to secure the loan and the sale of the collateral should be reduced from the overall intended loss.

In support, Severson cites *United States v. Mau*, 45 F.3d 212, 215-16 (7th Cir. 1995),which held that in a check-kiting scheme, the moment to determine the loss is the moment the loss is detected. But, at this juncture, we are not looking at Severson's kites, but at what he intended to keep from the bank when he received an unsecured million dollar loan. What Severson actually uses as support is the dicta in *Mau*, which states that in calculating the intended loss in a fraudulent loan case, "the amount of the loan can be offset by the value of the collateral the bank has or expects to gain at the time the fraud is discovered." *Id*. at 216. But in *Mau*, where the bank discovered the fraud and later had the defendant sign a note, secured by collateral, to cover the fraudulent overdrafts, we did not consider the value of the collateral in the intended loss because the secured note came after the kite had been discovered.

There was no error in finding that, in January 2003, at the time of the fraud, Severson intended to keep the entire loan; a mortgage was not filed contemporaneously with the receipt of the loan proceeds. Although, at sentencing, Severson's counsel stated that Severson would have testified to his intent to repay, the district court noted that "[i]f he really intended this to be a legitimate loan that he was going to repay, he would have filled out a mortgage at the time he signed it then and there, not months later when an auditor was approaching." If we boil it down, Severson received an unsecured one million dollar loan that he could not repay. Borrowing money without the intention to repay is akin to theft. *See Mau* 45 F.3d at 216 ("as in theft cases, loss is the value of the money, property or services unlawfully taken") (citation omitted). The district court did not just use the face value of the loan; rather it found that because the idea of repayment was ridiculous, Severson intended to walk away with the full fraudulently obtained amount. *See United States v. Johnson*, 16 F.3d 166, 172 (7th Cir. 1994). The bank's risk, which Severson intended it to risk by knowing he could not repay, was the total amount.

Finally, Severson argues that the district court erred when it included two Wisconsin misdemeanor convictions for dispensing alcohol without a license, *see* Wis. Stat. § 125.04(1), in calculating Severson's criminal history level. Because this challenge was not made before the district court, we review the criminal history calculation only for plain error. *United States v. Garrett*, 528 F.3d 525, 527 (7th Cir. 2008).

Severson argues that the misdemeanor convictions should not be counted because they are less serious than the included, listed crimes in USSG § 4A1.2(c)(1) and similar to the excluded offenses under USSG § 4A1.2(c)(2). We can quickly dispose of this argument; the district court was not absolutely bound by the sentencing commission's judgment since the Guidelines are merely advisory. The district court always has the obligation in the first instance to apply the Guidelines as written and properly calculate the advisory sentencing range; then the court's discretion kicks in and the district court has the right to, for whatever reason and despite what we may think, determine that the unlicensed selling of liquor at a racetrack was more serious than the trivial crimes listed in § 4A1.2(c)(2). Moreover, even if the district court erred by including an extra point in Severson's criminal history, his 141 month sentence would still have been below the revised Guideline range of 151-188 months. *United States v. Mount*, 966 F.2d 262, 265 (7th Cir. 1992) (review of misapplied Guidelines inappropriate if error was harmless).

## III. CONCLUSION

For the reasons discussed above, we AFFIRM Severson's conviction and sentence.