In the

# United States Court of Appeals

## For the Seventh Circuit

No. 19-2243

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

CARLOS MEZA,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:17-CR-00281 — **Elaine E. Bucklo**, *Judge.*

ARGUED SEPTEMBER 24, 2020 — DECIDED DECEMBER 23, 2020

Before EASTERBROOK, MANION, and KANNE, *Circuit Judges.*

MANION, *Circuit Judge.* Carlos Meza played two parts in a bizarre scam: stooge and swindler. Deep in debt, he fell for fraudulent international trading programs promising incredible profits. He then tricked people he knew into investing in these programs. The scam was a total hoax, with ridiculous promises. The district judge called the dupes "the most improbable victims" she had ever seen.

Meza stood trial on two counts of wire fraud. The jury acquitted him on Count I and convicted him on Count II. The judge sentenced him to 19 months in prison and ordered him to pay **$881,500** in restitution. The only issues before us involve the amount of loss for purposes of the Sentencing Guidelines and restitution. Meza challenges the judge's aggregation of losses under the Guidelines and her restitution calculation. We affirm.

## I. Facts

### A. Carlos Meza

Meza was CEO of Milwaukee McPherson, which was $20 million in debt. In 2012, he met Bob Adams of Renaissance Capital who offered a program promising incredible returns: $250,000 would yield $10,000,000 in 60 days. Meza wanted in but lacked funds. He also met Larry Gelfond and Terry Barnes who offered similar programs by Virginia Worldwide and Carso, LLC. Meza approached friends to raise funds. They testified he postured as a wealthy businessman with extensive investment experience. He misled them about details and risk, his wealth and experience, and the amount of his own investments. The victims wired funds to the programs or gave funds to Meza to forward. But he purloined some. As deals failed, he lulled the victims, inducing more investments. The victims invested **$1,176,500**,[1] and lost it all.

Meza testified he tried to help people. He trusted the Renaissance deal because Adams sold it. Meza said he thought victims Spencer, Crane, and Yacoub would "make a lot of

---

[1] Bold numbers are losses or arguable losses for Guidelines and restitution purposes.

money". As this appeal concerns loss determinations after a split verdict, we describe the victims and indictment.

**B. Scott Spencer**

Spencer testified first. He invested **$720,000** and lost it all. He was a business owner who met Meza at church around 2005. Spencer thought Meza was "an extremely successful entrepreneur". Meza said he owned Chicago properties, built homes, refurbished apartments, and had about 100 trucks. He spoke of international investments and contracts with Mexico. He said he owned a $10,000,000 complex, and showed Spencer. Meza postured as a "fairly substantial real estate investor." So Spencer asked Meza to go to North Dakota to opine on developments. Spencer paid for the trip. He wanted Meza to work on projects. For example, Meza shopped for a crane and arranged a loan. He fronted funds for this project. He did due diligence on another project. He arranged for a foreigner to work in America. Meza testified Spencer told him to use for these projects some of the funds Spencer wired.

Back from North Dakota, Meza approached Spencer about an international investment. Meza touted his experience and the incredible returns. He said Renaissance would lease funds to Spencer and him in exchange for funds they invested. Meza said the principal was 100% guaranteed. He said he had partners all over the world. He personally ensured Spencer would not lose his investment. Meza said the 60-day investment needed $250,000 a month. Spencer testified: "I was going to put in 250,000, he was going to put in 250,000." Meza said $250,000 would return nearly $10,000,000 in about 60 days.

Meza said his people investigated Adams and Renaissance. Meza gave Spencer a contract between Milwaukee

McPherson and Renaissance identifying the former as an "accredited investor". Spencer assumed based on their relationship that Meza was qualified because he said so. Meza admitted at trial that the contract he gave Spencer identified Milwaukee McPherson as an accredited investor although that was false. It also said: "Milwaukee represents and warrants that Milwaukee is able to conduct or arrange for certain principal risk free transactions, without exposing the Funds to any risk whatsoever … ." To Spencer, this matched Meza's assurances about 100% safety. Spencer also thought the escrow clause bolstered Meza's claim of control over the funds.

Spencer did not investigate before investing because he trusted Meza. The documents impressed Spencer. Meza said the funds would be safe, he controlled the deal, and the principle was 100% guaranteed. Spencer thought Meza was everything he said, with millions in personal worth, many trucks, many contracts, businesses in Ecuador, and millions in South America. And Meza said he would put in his own $250,000. He had skin in the game. Relying on all this, Spencer invested. On May 16, 2012, he wired **$200,000** to Milwaukee McPherson. But Meza only sent $100,000 of this to the escrow. He testified he used some of the rest for other purposes, including Spencer's other projects. Meza testified he kept $50,000 as a loan to him from Renaissance which he later repaid.[2] On June 18, 2012, Spencer wired **$80,000** to Milwaukee McPherson.[3] Meza testified he sent this to Renaissance.

---

[2] He testified he repaid that loan by borrowing $50,000 from a company called ALSJ, Inc. But ALSJ was a "hard lender" so he borrowed **$50,000** from Cordell Crane to pay off ALSJ.

[3] The additional **$30,000** was supposedly for fees.

The details of the sums Meza withheld from Spencer's initial investment are garbled in the record, but they are not germane here. Suffice it to say Spencer testified he expected all **$280,000** to go to the investment, but Meza did not satisfy that. Spencer said he and Meza never discussed any other use for this sum, and Meza never said he would not send it all to Renaissance, or would use any of it for other purposes. This information would have affected Spencer's decision to invest.

So Spencer expected $10,000,000 in 60 days. But then Meza said a trader slowed the deal, and if they bought this trader out, the deal could occur almost immediately, but certainly within another 60 days. Meza gave Spencer a document apparently showing Renaissance had access to $14,000,000, exceeding Spencer's expectations, restoring his confidence. So he wired $15,000 to Milwaukee McPherson on August 21, 2012, thinking it was for legal fees for the buyout.[4]

On September 24, 2012, Meza spoke with Adams by phone and recorded the call. Meza said he wanted to know how this works. He said his wife was ready to kill him; she thinks this whole thing is baloney. He said his partners would think him nuts if he told them the proceeds Adams discussed. Meza thought he played this recording for Spencer and Crane.

Meza told Spencer they could buy out the recalcitrant trader for $400,000. So Spencer borrowed **$400,000**[5] (at 36% interest) and wired it per Meza's instructions on October 18,

---

[4] The government did not claim this $15,000 as a loss for sentencing purposes, and the judge did not include it, so we will not mention it again.

[5] This number varied at trial. Meza testified that Spencer borrowed $418,000, it was wired to Meza, he in turn sent $400,000 to Renaissance, and the balance of $18,000 returned to Spencer.

2012. Spencer testified he would not have given this **$400,000** had he known his **$280,000** had not all gone to Renaissance.

Meza continued to give Spencer excuses. On December 19, 2012, Meza wired $7,000 for interest on Spencer's loan. A month or so later, Meza paid another $13,500 for interest. In April 2013, Meza apologized because Spencer was still paying interest. Meza assured Spencer the returns were coming through soon but details had to be ironed out. He said he had a deal involving Virginia Worldwide very similar to Renaissance. Meza said money sat in a San Francisco bank, and he had people en route to pick it up. He said it was already transacted. He asked Spencer for $50,000 and said he would get this back plus another $50,000. They talked about a payment schedule and memorialized their agreement. Spencer wrote "Contract" on a white board, wrote the details, both signed, and Spencer photographed the board. Here is a summary:

- Spencer agreed to give Meza $50,000 for Virginia Worldwide deal by April 19, 2013.
- Meza promised to repay Spencer $50,000 by April 29, 2013, or sell apartment by May 15, 2013, to repay.
- Meza would receive $400,000 from Virginia Worldwide deal on April 26, 2013, and would give Spencer "$200,000 repayment and $50,000 initial investment."
- Meza would receive $2,600,000 from Renaissance investment on May 3, 2013, to split evenly with Spencer.
- On May 20, 2013, Meza would evenly split with Spencer another $9,100,000 from Renaissance.
- On May 17, 2013, Meza would evenly split with Spencer "the balance of the $25 million".

So Spencer wired **$40,000** to Virginia Worldwide on April 19, 2013, at Meza's directions. (This was $10,000 shy, as

Spencer lacked more.) After the first due date, he asked where the money was and Meza made excuses. In June 2013, Meza said he would make Spencer's June mortgage payment. Meza also said he would get funds from South America for Spencer. That never happened. About July 2013, Spencer learned Meza did not own all the assets he claimed would cover Spencer. He received no returns. He lost **$720,000**.

### C. Cordell Crane

Crane invested **$316,500**, a total loss. He met Meza in church around 2000. They became friends. Crane gathered Meza was in various businesses, including brokerage, real estate, trucking, and investments. Meza said he was successful and had a large net worth. In September 2012, he pitched to Crane: "Meza said that he had a sure-thing investment for me with an associate of his … Bob Adams with Renaissance Capital." Meza said this would yield a good, quick return. He asked Crane to invest $50,000. Meza said Adams was his partner. Meza said Crane would receive about 20 to 30% return in a few months. Meza gave his personal assurance and offered to put a lien on a property on Ravenswood in Chicago. He said there was no risk; it was a sure thing. He did not tell Crane that his funds would go anywhere other than Renaissance, or that Meza would spend any. Obviously, Crane would not have invested had he known Meza would pilfer.

Meza and Crane signed an agreement on September 10, 2012: Milwaukee McPherson guaranteed a return of 20 to 30% by December 1, 2012. Based on Meza's statements, Crane also understood he would get his principal back by December. He understood there was no risk given Meza's personal guarantee. So Crane wired **$50,000** to Milwaukee McPherson per

Meza's instructions. Meza used this sum to pay off the loan from ALSJ he had taken to pay off the loan from Renaissance.

The first guaranteed return date passed without payment. Meza asked Crane for **$6,500** to prepay investment taxes. So Crane gave him that on January 4, 2013. Crane later learned Meza used this for Milwaukee McPherson's bankruptcy. In June 2013, Meza said he needed a flow for Renaissance. So Crane gave him another **$10,000**. At first, Meza said he would return that to Crane soon. But that did not happen. Then Meza said he would raise Crane's return to $250,000. But Crane never got that. Meza blamed Adams, Renaissance, and the funds. Crane tried to put a lien on the Ravenswood property but found it already under several liens.

In July 2013, Meza pitched another investment to Crane. As they sat in Meza's car talking about Crane's job loss, Meza got a call from Barnes about an incredible opportunity. Meza asked Crane about raising $250,000, which would guarantee a $5,000,000 return in months. Unemployed, Crane had access to retirement funds for three months. Meza said he knew how to invest on his own and he could control it, and there was a 100% chance it would go forward. He said it would fix everything that had gone wrong. He said he had access to an inner circle of professional, elite traders who made the trades behind the trades. He indicated there was no risk. He said Crane's money would be used as collateral in an attorney IOLTA account so it would not be at risk. Meza said he could be certain Crane would get his money back. Crane said the only way he could get $250,000 was from his retirement and his children's education fund, and the money must return in three months. Meza said no problem, so Crane agreed. They put it in writing. Item 1 was a loan from Crane to Meza

outside the alleged scheme. Item 2 was the Renaissance investment of **$50,000** plus **$6,500** plus **$10,000** for a return of $250,000 tax free. Item 3 was the investment of **$250,000** for a return of $5,000,000 paid $1,000,000 each month for the next five, first payment due in two weeks.

So at Meza's directions, Crane wired **$250,000** to Palmore Legal Services in July 2013. Crane trusted Meza. But two weeks later, Crane did not receive $1,000,000. Meza said money was tied up in Europe, there was an incorrect code, and a vice president was unavailable to sign. Then Meza said Crane's funds were in New York. Meza flashed his iPad showing huge deposits and continued to assure. But Crane's deadline to return retirement funds passed. Meza told Crane not to worry and said he was making enough to cover all tax consequences. Meza "kept the deception alive." Crane got no return on these investments. He lost all he gave.

**D. Ray Yacoub**

Yacoub, the third victim to testify, invested **$50,000** and lost it all. He owned an auto repair shop serving Meza. In June 2013, Meza approached Yacoub about an investment opportunity. Meza said it was a sure thing. Yacoub overheard him talking on the phone about investments. Meza said he had most of his money in this investment. He said if Yacoub invested $50,000 he would get $250,000. Meza even wrote a check for $250,000 and gave it to Yacoub to deposit when instructed. Meza said the return would not take more than months. So Yacoub wired **$50,000** to Palmore Legal Services, per Meza's instructions. When months passed with no return, Yacoub asked Meza about the investment. He said it was happening but he was waiting for the government to release

funds. Yacoub never received any return. On cross, he acknowledged he knew it involved risk.

**E. Other victims**

Two victims did not testify at trial: Thomas George and David Tomlinson. The government submitted reports of interviews documenting their losses. George told law enforcement he made two payments toward an international investment opportunity with Meza: **$50,000** in April 2013 and **$10,000** in June 2013. He did this based on Meza's representations regarding his prior investing experiences. George lost it all. Tomlinson told law enforcement he wired **$15,000** to a trust account in August 2013 because Meza promised a short-term return. Tomlinson lost it all.[6]

## II. Procedural Posture

**A. Indictment**

The government charged Meza with two wire-fraud counts. The indictment alleged he solicited funds from friends and associates to invest with him in trading programs. He misled these investors about his financial background and wealth. He lied about being a multi-millionaire, owning multiple properties in Chicago, having millions of dollars in South America, and owning 100 construction trucks. He misled investors about his knowledge of the investments' nature and legitimacy, the traders involved, the risk, and the timing and rate of return. He made materially false promises and guarantees. He fraudulently induced multiple victims, including Spencer and Crane, to entrust money to him and

---

[6] Another victim—Randy Stroh—did not testify at trial. The judge excluded his **$15,000** loss given its timing.

others via wires. Meza converted tens of thousands of their dollars to himself, without their knowledge or consent.

Count I accused Meza of knowingly causing **$200,000** to be wired from Spencer to Milwaukee McPherson on May 16, 2012, for the purpose of executing the scheme. Count II accused Meza of knowingly causing **$50,000** to be wired from Crane to Milwaukee McPherson on September 19, 2012, for the purpose of executing the scheme.

**B. Trial**

After the government rested, Meza moved for acquittal, arguing it failed to prove his "knowledge of the overall fraudulent scheme and whether he used that knowledge … to commit a fraud." He argued he performed jobs for Spencer, so reasonably believed he was entitled to pay himself for his expenditures and work. He argued the evidence showed he believed in the investments. He said he was puffing. He was not lying because he believed. The judge said, "I have to say [these are] the most improbable victims I've ever seen. But I guess that doesn't mean that you can't be defrauded … ." She denied the motion. The jury rendered a spit verdict, finding Meza not guilty on Count I but guilty on Count II.

**C. Sentencing**

Sentencing focused on the loss amount. Meza argued the only loss, for Guidelines and restitution purposes, was the **$50,000** he admitted he owed Crane for his September 19, 2012 wire, the Count II trigger. But the government argued the loss was all sums victims transferred under the scheme: **$1,176,500**, including Spencer's Count I trigger loss for which the jury found Meza not guilty and losses sustained by

victims who did not testify. The government charted the losses it claimed:

| No. | Victim | Date | Investment |
|-----|--------|------|------------|
| 1 | Scott Spencer | 5/16/2012 | **$200,000** |
| 2 | Scott Spencer | 6/18/2012 | **$80,000** |
| 3 | Randy Stroh | 6/2012 | **$15,000** |
| 4 | Cordell Crane | 9/19/2012 | **$50,000** |
| 5 | Scott Spencer | 10/18/2012 | **$400,000** |
| 6 | Cordell Crane | 1/4/2013 | **$6,500** |
| 7 | Scott Spencer | 4/19/2013 | **$40,000** |
| 8 | Thomas George | 4/30/2013 | **$50,000** |
| 9 | Thomas George | 6/12/2013 | **$10,000** |
| 10 | Cordell Crane | 6/14/2013 | **$10,000** |
| 11 | Raid Yacoub | 6/24/2013 | **$50,000** |
| 12 | Cordell Crane | 7/9/2013 | **$250,000** |
| 13 | David Tomlinson | 8/26/2013 | **$15,000** |
| | | **TOTAL=** | **$1,176,500** |

Given the split verdict, the judge said she was inclined not to "overrule" the jury, even if "technically" she could. So she excluded **$280,000** transferred by Spencer in May and June 2012. She also excluded **$15,000** from Stroh in June 2012.

The government argued the loss should at least include all sums victims gave at Meza's instructions from and including September 2012 forward. It argued that whatever the jury

thought about Meza at the scheme's start, the jury concluded that by September 2012 when Crane wired **$50,000**, Meza knew about the problems and lied. He lied about the investments being sure things. He did not tell Crane that Spencer lost **$280,000**. Then, when Meza asked Spencer for **$400,000**, Meza did not tell Spencer that Crane lost **$50,000**. Then in 2013, Meza approached George and told him about a 100% guaranteed investment in a program. Meza said he had success in these programs, even though he lost hundreds of thousands of other people's dollars. And so on with all further solicitations. The government argued the loss was at least **$881,500** (the chart's total minus the first three entries).

Meza argued he was entitled to part of Spencer's initial **$280,000** as compensation for work on Spencer's projects. But the judge noted that made no difference because she was excluding this **$280,000** from the amount of loss, given the jury's verdict. Meza argued the **$400,000** submitted by Spencer should also be excluded because that sum went through Meza to Renaissance without Meza taking any. But the judge observed that made no difference in calculating the loss amount. A loss is a loss, regardless of which swindler gained.

So the judge found the loss amount for Guidelines and restitution purposes to be **$881,500**. This raised the offense level by 14 and produced a range of 46 to 57 months in prison. The judge sentenced Meza to 19 months and ordered restitution.

### III. Analysis

### A. Sentencing Guidelines

Meza argues the judge erred in calculating the loss under the Guidelines. Both sides agree we review Guidelines findings of loss for clear error. *United States v. White*, 883 F.3d 983,

986 (7th Cir. 2018). Meza "bears a heavy burden: he must show that the court's loss calculations were not only inaccurate but outside the realm of permissible computations." *United States v. Collins*, 949 F.3d 1049, 1053 (7th Cir. 2020) (internal quotation marks omitted). As Meza admits, the government only needed to prove the loss amount by a preponderance of the evidence. This "requires only that the fact-finder believe that the existence of a fact is more probable than its non-existence, and for the purposes of determining the loss amount, a reasonable estimate is sufficient." *United States. v. Orillo*, 733 F.3d 241, 244 (7th Cir. 2013). Even acquitted conduct—with at least a reasonable doubt—could contribute to the loss amount if proven by a preponderance. *See* U.S.S.G. §1B1.3(a)(2); *see also United States v. Austin*, 806 F.3d 425, 433 (7th Cir. 2015).

As Meza acknowledges, a court will aggregate losses to victims of "the same course of conduct or common scheme or plan" as the offense of conviction. U.S.S.G. §1B1.3(a)(2); *United States v. Locke*, 643 F.3d 235, 243 (7th Cir. 2011). Because the offense of wire fraud is a scheme, the loss amount can include losses incurred in the entire scheme, not just losses from the individual transactions specified in the indictment. *United States v. Brown*, 47 F.3d 198, 203 (7th Cir. 1995).

The indictment accused Meza of devising and participating in *a*—singular—scheme to defraud. The indictment charged him with two counts of wire fraud. Wire fraud consists of four elements, framed in the jury instructions as: 1) defendant knowingly devised or participated in a scheme to defraud; 2) defendant did so with the intent to defraud; 3) the scheme to defraud involved a materially false or fraudulent pretense, representation, or promise; and 4) for the purpose

of carrying out the scheme or attempting to do so, defendant caused interstate wire communications to occur.

Count I was 12 paragraphs. The first 11 explained the scheme. The twelfth identified Spencer's wire transfer of **$200,000** on May 16, 2012, as the fourth element of Count I. Count II was two paragraphs. But the first incorporated the first 11 of Count I. Meza's appellate briefs continuously say Count II "purports to incorporate". But in this context, incorporation executes itself. One part incorporates another merely by saying so. Purporting to incorporate is incorporating. Fed. R. Crim. P. 7(c)(1) ("A count may incorporate by reference an allegation made in another count."). *See United States v. Jin Hua Dong*, 675 F.3d 698, 702 (7th Cir. 2012) ("However, he fails to acknowledge that fraud causing a loss to Countrywide was expressly stated in the description of the scheme contained in paragraphs 1 through 67 of Count One, which was incorporated by reference in Counts Seven and Eight."); *United States v. O'Connor*, 656 F.3d 630, 646 (7th Cir. 2011) ("But the wire-fraud count against her incorporated by reference the entire fraudulent scheme."). So when Meza argues Crane was the only victim in Count II, this is incorrect.[7]

The jury rendered a split verdict: not guilty on Count I, guilty on Count II. But this did not exonerate Meza from the entire scheme alleged in Count I because this scheme (other

---

[7] Meza does not argue to us that Count II should have been dismissed as defective, even though Counts I and II are arguably multiplicitous by charging one crime in two counts. Nor does he argue the government needed leave to incorporate, or incorporation is impossible here, or copying and pasting would have been better, or two counts of wire fraud cannot stem from one scheme. *See United States v. Turner*, 551 F.3d 657, 659 (7th Cir. 2008) (single scheme supported four wire-fraud counts).

than Spencer's first **$200,000**) was incorporated into Count II. The judge accounted for the verdict by excluding Spencer's first **$200,000**, his next **$80,000**, and Stroh's **$15,000** from the loss amount, even though acquitted conduct can be included for the purpose of relevant conduct. The trial and sentencing hearing support her rationale for excluding this **$295,000** but including **$881,500**. Maybe at first Meza was duped, and he believed what he said. But when 60 days passed and millions did not pour in, he knew there was a problem. And when he still made unfounded guarantees and wild promises, now he knew they were unfounded and wild, and the investments were frauds. He lied.

The judge rejected Meza's argument that loss is limited to **$50,000** because he did not keep certain funds. She properly explained that made no difference. The amount of loss for Guidelines calculations is measured by the victims' losses, not any particular swindler's gains. She explained that the mere fact that Meza did not pocket certain sums meant only that someone else "ought to be responsible as well for the fraud."

And when considering the §3553(a) factors, the judge recognized that Meza might have initially been deceived about the investments, but also found that he deceived the victims.

Thus, the judge accounted for the split verdict. She excluded all losses before the wire supporting Count II. She included only losses sustained at and after the Count II wire. Whatever Meza thought initially, by September 2012 he had seen the fraud exposed. He had seen the due date for incredible returns pass without the promised bonanza. He knew by then he was involved in fraud. Yet he continued to perpetrate the fraud by making multiple material misrepresentations to induce further investments. The judge included the losses

from and including September 2012 forward. Indeed, these losses were not merely attributable to relevant conduct; these losses were actual offense conduct. Three victims testified at trial: Spencer, Crane, and Yacoub. The government submitted reports about two more victims: George and Tomlinson. The evidence showed Meza's fraud caused their losses, at least as of September 2012.

Meza says on appeal that his principal objection below to the loss calculation was that the convicted offense was lying about where Crane's money would go and using Crane's money to pay off a loan.[8] Meza claims investors other than Crane either did not send their money to Meza at all, or did send it to him and he forwarded it to the investment. But the record regarding Spencer (and regarding Crane's investments beyond the Count II triggering wire) belies this. Meza argues the jury acquitted him of the "broad charge" in Count I alleging false statements about his finances, businesses, background, and experience. But Count II was just as broad and included the same lies.

Meza argues the government's closing argument "worsened" the "ambiguity in the indictment". He claims the government argued that the Count II offense was Meza's fraudulent personal use of Crane's funds after promising the money would go to the investment. But we read the transcript. The government's arguments about Count II were not so myopic.

For example, Meza quotes the government out of context: "In the Government's words, 'Count Two charges defendant with wire fraud in relation to Cordell Crane's initial $50,000

---

[8] Meza points to a page in the sentencing transcript. But that page does not make that argument directly and at best only hints at it.

investment that was supposed to go to Bob Adams.'" But here the government was merely explaining what the fourth-element wire trigger was for Count II. And in the prior sentence the government said: "Count One charges defendant with wire fraud in connection with Scott Spencer's initial $200,000 investment that was supposed to go to Bob Adams." But that in no way means Count I was limited to a single sum. Nor was Count II so limited.

As another example, Meza again cherry picks a quote from the government's closing: "[T]he Government during closing argument characterized the basis for Count Two as Mr. Meza's telling Mr. Crane 'your money is going towards an investment, and he sends it somewhere else.'" But Meza omits the prior page of the transcript, where the government talked about other lies Spencer told Crane to get him to make this transfer:

> Let's turn to Cordell Crane and the lies that the defendant told. The lies the defendant told him to sweeten the pot. Cordell Crane invests $50,000 in September of 2012. That's three months after Mr. Spencer's investment. Three months after. There have been no returns. You're getting excuses from Renaissance Capital, Bob Adams, as you've heard. Does the defendant tell Cordell Crane that the money hasn't come through, things are late? No, he doesn't. He tells him exactly what he told Mr. Spencer: This is a sure thing.

This reasoning during closing argument supported the judge's loss determination. So Meza is wrong in arguing the government limited Count II to a theory of pilfering completely separate and unique from the Count I trigger wire and the rest of the fraudulent scheme. Besides, the jury heard

about Meza pilfering multiple transfers, not just the Count II trigger wire.

Meza faults the judge for failing to explain reasons for aggregating losses. But she did explain. She heard Meza argue loss should be **$50,000**; she expressly rejected that. She excluded all losses around the time of the wire supporting the acquitted count: **$295,000**. She only included losses from Crane's September 2012 payment and on. The sentencing hearing covered the misrepresentations and losses in detail. The judge observed that at a point, Meza "knew that nothing was … coming back, and he isn't telling them." She expressly agreed with the government's multiple reasonable arguments. She did not commit clear error. Her calculations were within the realm of permissible computations. The record supports them. *See United States v. Durham*, 766 F.3d 672, 687 (7th Cir. 2014).

**B. Restitution**

The judge ordered **$881,500** in restitution. Meza argues this includes unconvicted and acquitted conduct. He argues that for the judge to award restitution to victims not specifically identified in the convicted charge, she had to adequately demarcate the scheme. He urges that it is plain error to award restitution for unconvicted or acquitted conduct, or to persons who were not victims of the convicted conduct. He accepts that we review restitution calculations for abuse of discretion. *United States v. Frith*, 461 F.3d 914, 919 (7th Cir. 2006).

The Mandatory Victim Restitution Act mandates restitution to crime victims. 18 U.S.C. §3663A. When the convicted offense "involves as an element a scheme, conspiracy, or pattern of criminal activity," restitution is required for "any

person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." *Id.* §3663A(a)(2). Restitution is "limited to the actual losses caused by the specific conduct underlying the offense, and, like the loss amount, the government must establish that by a preponderance of the evidence." *Orillo*, 733 F.3d at 244.

Meza argues restitution included unconvicted and acquitted conduct. Not so. The convicted count was not limited to one loss occasioned by the particular triggering wire. Rather, that count involved a scheme as an element, and incorporated most of the indictment. We have explained that "the crime comprehended by the mail and wire fraud statutes is the scheme to defraud, not just the isolated iterations of wire transmissions or mailings, so restitution for victims of the overall scheme is required." *Locke*, 643 F.3d at 247.

The judge adequately demarcated the scheme given the jury's finding on Count I. She excluded Spencer's **$200,000** wire triggering Count I and also excluded his **$80,000** and Stroh's **$15,000** around the same time. The record supports the rationale for demarcating the scheme by bifurcating it at September 2012. Meza might initially have believed what he said about the wild investments. But by September 2012, he had seen the outrageous returns fail to materialize, yet he continued the scam. The judge honored the verdict by not including **$295,000** in restitution. She did not abuse her discretion.

## IV. Conclusion

The judge committed no reversible error in calculating loss for Guidelines and restitution purposes. We affirm.