In the

# United States Court of Appeals

## For the Seventh Circuit

No. 14-1510

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

SAMANTHA SYKES,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:10-cr-00713-3 — **Samuel Der-Yeghiayan**, *Judge.*

ARGUED OCTOBER 1, 2014 — DECIDED DECEMBER 29, 2014

Before WOOD, *Chief Judge*, and RIPPLE and TINDER, *Circuit Judges*.

RIPPLE, *Circuit Judge.* Samantha Sykes pleaded guilty to participation in a bank fraud scheme, in violation of 18 U.S.C. § 1344, and was sentenced to fifty-seven months' imprisonment. At sentencing, the district court determined that her total offense level was twenty-three and that her criminal history category was III, thus resulting in an advisory guidelines range of fifty-seven to seventy-one months. In arriving

at this offense level, the district court applied two enhancements. First, the court determined that Ms. Sykes could reasonably have foreseen, and thus was responsible for, the scheme's entire intended loss amount of $653,417. This determination resulted in a fourteen-level enhancement under United States Sentencing Guideline § 2B1.1(b)(1)(H). Second, the court determined that a two-level enhancement was warranted under § 2B1.1(b)(10)(C), because Ms. Sykes's offense involved "sophisticated means." Finally, the district court considered and rejected her submission that family circumstances justified a below-guidelines sentence. Ms. Sykes then brought this appeal.

We hold that the district court was correct in its determination that the evidence supported the fourteen-level enhancement. The district court correctly interpreted the applicable guideline provision and did not clearly err in its estimation of the factual record. We also believe that the court was correct in its view that the fraudulent scheme involved sophisticated means. Lastly, after examination of the record, we are convinced that the district court adequately took into account Ms. Sykes's family circumstances in imposing sentence.

# I

## BACKGROUND

### 1.

From October 2007 to November 2009, Ms. Sykes and her confederates, Chauncey Hicks, Terence Sykes, Tacara Tanner, Philip Morris, and Michelle Pittman, participated in a scheme to defraud Chicago area banks through a check-

kiting scheme. To execute this scheme, the defendants recruited individuals, known as nominees, to open checking accounts with the victim banks in the names of fictitious businesses. The defendants then fraudulently inflated the balance of those accounts with worthless checks and then withdrew funds from the accounts before the banks discovered that the checks were worthless.

Ms. Sykes's cousin and fellow recruiter, Terence Sykes, with whom Ms. Sykes lived during the relevant period, introduced her to the scheme. Before joining, she discussed her involvement with Hicks, the leader of this scheme; he had responsibility for creating the fraudulent business documents used by the nominees to open checking accounts.

In total, the scheme employed five recruiters and forty-seven nominees. The scheme's participants fraudulently opened approximately 336 accounts at approximately eight different banks. Ms. Sykes acted as a recruiter for the scheme. She also assisted at least five nominees by going with them to open fraudulent bank accounts. She had recruited some of the nominees whom she coached; other individuals had recruited the remainder. Overall, the scheme fraudulently inflated accounts by a total of $653,417, of which $506,507 was actually withdrawn. In her plea agreement, Ms. Sykes admitted that "as a result of her and others' participation in the scheme, the nominee account balances at the victim banks were fraudulently inflated by at least approximately $184,400," of which $116,106 was withdrawn.[1]

---

[1] R.95 at 6.

**2**.

A grand jury indicted Ms. Sykes and her codefendants on ten counts of bank fraud, in violation of 18 U.S.C. § 1344. After signing a plea agreement, Ms. Sykes, on November 29, 2011, pleaded guilty to one count (Count Six) of the superseding indictment. The presentence report ("PSR") calculated her total offense level at twenty-three and her criminal history category at III. This calculation resulted in an advisory guideline range of fifty-seven to seventy-one months' imprisonment. In determining the total offense level, the PSR applied two enhancements. First, it concluded that Ms. Sykes reasonably could have foreseen, and thus was responsible for, the scheme's entire intended loss amount of $653,417. This determination resulted in a fourteen-level enhancement under § 2B1.1(b)(1)(H). Second, applying § 2B1.1(b)(10)(C), the PSR further determined that a two-level enhancement was warranted because Ms. Sykes's offense had involved "sophisticated means."

Ms. Sykes also presented a sentencing memorandum to the district court. She raised three points that are relevant to her appeal. First, she disputed the PSR's conclusion that she reasonably could have foreseen Hicks's entire scheme. Consequently, in her view, she could not be held responsible for the entire $658,417 loss caused by the illegal activity. Rather, she submitted that she could only foresee, and thus should only be held accountable for, the $196,400 loss that directly resulted from her participation in the scheme.[2] Second,

---

[2] In arguing that she caused, and thus reasonably could foresee, $196,400 in loss, Ms. Sykes's sentencing memorandum relied on an exhibit which purported to be her plea agreement. *See* R.190 at 4. This exhibit, however,

(continued…)

Ms. Sykes argued that she did not use any sophisticated means in carrying out her offense. Finally, she invited the court's attention to her dire family circumstances: that she was the sole caregiver of her two children and that, as a practical matter, there would be no caregiver to substitute for her if she were to receive a custodial sentence. She asked the district court to consider this unfortunate circumstance in mitigation and submitted that it warranted a below-guidelines sentence.

At the sentencing hearing, the district court rejected each of Ms. Sykes's submissions. Instead, the district court took the view that she reasonably could have foreseen the entire loss inflicted by the scheme on the victim banks. The court noted that Ms. Sykes had "admitted that she knew what the scheme entailed and knew that she was participating in a larger scheme," and knew that at least one other person, Terence Sykes, was recruiting nominees for the scheme.[3]

---

(…continued)

contained several discrepancies with Ms. Sykes's actual plea agreement filed with the district court. Notably, this exhibit stated that "as a result of her and others' participation in the scheme, the nominee account balances at the victim banks were fraudulently inflated by at least approximately $196,400." R.190-1 at 6. In contrast, her actual plea agreement stated this figure to be $184,400. R.95 at 6. It is unclear how Ms. Sykes arrived at the figure of $196,400. This precise figure does not appear to have any basis in the record. Nevertheless, this discrepancy is irrelevant to Ms. Sykes's sentence given that the enhancement applicable under the Sentencing Guidelines would be the same for both amounts. *See* U.S.S.G. § 2B1.1(b)(1).

[3] R.219 at 14.

The district court also agreed with the PSR that the scheme had utilized sophisticated means; the court focused in particular on the scheme's use of fictitious entities and the need to coordinate time-sensitive conduct among numerous coconspirators. Finally, the district court considered and rejected Ms. Sykes's submission that her family circumstances justified a sentence reduction. The court explained that she "ha[d] not pointed to sufficient facts to show that her family situation [was] so extraordinary to warrant a non-custodial sentence."[4] The district court ultimately sentenced Ms. Sykes to fifty-seven months' imprisonment. This sentence was at the bottom of the applicable guidelines range.

Ms. Sykes now asks us to review these sentencing decisions of the district court.[5]

## II

## DISCUSSION

### 1.

We first address Ms. Sykes's contention that the district court erred when it increased her guidelines offense level by fourteen based on its finding that the fraud loss caused by her coconspirators had been reasonably foreseeable to her. The standards that govern this inquiry are well-settled. We review a district court's interpretation and application of the

---

[4] *Id.* at 36.

[5] The district court's jurisdiction was predicated on 18 U.S.C. § 3231. Our jurisdiction is predicated on 18 U.S.C. § 3742(a)(2) and 28 U.S.C. § 1291.

Sentencing Guidelines de novo and its factual findings for clear error. *United States v. Wright*, 651 F.3d 764, 774 (7th Cir. 2011).

To calculate a defendant's offense level under the Sentencing Guidelines, a district court first determines the base offense level and then applies specific offense characteristics. *See United States v. Salem*, 597 F.3d 877, 884 (7th Cir. 2010). In cases involving property offenses, the applicable specific offense characteristic depends on the amount of "loss" resulting from the defendant's crime. The Guidelines define "loss" as "the greater of actual loss or intended loss." U.S.S.G. § 2B1.1 cmt. n.3(A). "Actual loss," in turn, is defined as follows:

> (i) Actual Loss.—"Actual loss" means the reasonably foreseeable pecuniary harm that resulted from the offense.
>
> ….
>
> (iv) Reasonably Foreseeable Pecuniary Harm.—For purposes of this guideline, "reasonably foreseeable pecuniary harm" means pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense.

*Id.* § 2B1.1 cmt. n.3(A)(i), (iv).

"Specific offense characteristics depend not only on the offense of conviction but also on relevant conduct." *Salem*, 597 F.3d at 884. In cases involving "jointly undertaken criminal activity," relevant conduct is determined on the basis of "all reasonably foreseeable acts and omissions of others in

furtherance of the jointly undertaken criminal activity." U.S.S.G. § 1B1.3(a)(1)(B). Thus, when calculating "loss" under § 2B1.1(b)(1), "[s]ection 1B1.3(a)(1)(B)…indicates that [if a] defendant [is] engaged in a criminal scheme with other individuals, the court should calculate the loss based not only on the defendant's own actions, but 'all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity.'" *United States v. Adeniji*, 221 F.3d 1020, 1027 (7th Cir. 2000).

Our case law requires that § 1B1.3(a)(1)(B) be applied through a two-step analysis. *See United States v. Aslan*, 644 F.3d 526, 536 (7th Cir. 2011). "With respect to the loss amount that can be attributed to a defendant, the court must determine (1) whether the acts resulting in the loss were in furtherance of jointly undertaken criminal activity; and (2) whether those acts were reasonably foreseeable to the defendant…." *Id.* at 536–37. Ms. Sykes does not contest the district court's finding regarding the scope of her jointly undertaken criminal activity. Her contention therefore turns on whether the district court correctly determined that she reasonably could have *foreseen* the scope of the fraudulent activity. We review the sentencing court's foreseeability findings for clear error. *Id.* at 537.

The concept of foreseeability is employed in many legal contexts. It is important, therefore, that we pause and ensure that we focus on the role it plays in the administration of this guideline. The application note to § 1B1.3 provides an excellent starting point:

> Because a count may be worded broadly and include the conduct of many participants over a period of time, the scope of the criminal ac-

tivity jointly undertaken by the defendant (the "jointly undertaken criminal activity") is not necessarily the same as the scope of the entire conspiracy, and hence relevant conduct is not necessarily the same for every participant. In order to determine the defendant's accountability for the conduct of others under subsection (a)(1)(B), the court must first determine the scope of the criminal activity the particular defendant agreed to jointly undertake (*i.e.*, the scope of the specific conduct and objectives embraced by the defendant's agreement). The conduct of others that was both in furtherance of, and reasonably foreseeable in connection with, the criminal activity jointly undertaken by the defendant is relevant conduct under this provision. The conduct of others that was not in furtherance of the criminal activity jointly undertaken by the defendant, or was not reasonably foreseeable in connection with that criminal activity, is not relevant conduct under this provision.

….

Note that the criminal activity that the defendant agreed to jointly undertake, and the reasonably foreseeable conduct of others in furtherance of that criminal activity, are not necessarily identical. For example, two defendants agree to commit a robbery and, during the course of that robbery, the first defendant assaults and injures a victim. The second defend-

ant is accountable for the assault and injury to the victim (even if the second defendant had not agreed to the assault and had cautioned the first defendant to be careful not to hurt anyone) because the assaultive conduct was in furtherance of the jointly undertaken criminal activity (the robbery) and was reasonably foreseeable in connection with that criminal activity (given the nature of the offense).

U.S.S.G. § 1B1.3 cmt. n.2.

As the commentary makes clear, "[f]oreseeability is not equivalent to actual knowledge." *Aslan*, 644 F.3d at 537. A defendant need not know of a coconspirator's actions for those actions to be reasonably foreseeable. *Id.* Nor does this standard require that a defendant interact with, or even know of, her fellow coconspirators, provided of course that the involvement of the others and their actions in furtherance of the conspiracy were reasonably foreseeable. *See United States v. Wang*, 707 F.3d 911, 916 (7th Cir. 2013) (holding that a defendant could reasonably foresee the loss caused by forty-one other coconspirators even though he only knew of three others that were involved in the conspiracy); *Adeniji*, 221 F.3d at 1028–29; *United States v. Tauil-Hernandez*, 88 F.3d 576, 579 (8th Cir. 1996). Rather, a "court [can] determine reasonable foreseeability based on whether [the defendant] demonstrated a substantial degree of commitment to the conspiracy's objectives, either through his words or his conduct." *Wang*, 707 F.3d at 916 (internal quotation marks omitted).

Ms. Sykes argues that she could reasonably foresee only that amount of fraud loss that she directly caused, that is,

$196,400 in loss.[6] We do not believe that the record supports Ms. Sykes's assertion. The scheme in which she was involved utilized approximately five recruiters and forty-seven nominees. She was a recruiter for the scheme and assisted at least five nominees by going with them to open fraudulent bank accounts. Some of these nominees were individuals who had been recruited by others. Her cousin, and fellow recruiter, Terence Sykes, introduced her to the scheme and was her roommate during the course of the scheme. Ms. Sykes also knew, and regularly communicated with, Hicks, the scheme's leader.

Moreover, in holding Ms. Sykes responsible for $658,417 in loss, the total intended fraud loss caused by the scheme, the district court noted that "[t]he defendant admitted that she knew what the scheme entailed and knew that she was participating in a larger scheme," and "that the defendant knew that at least one other person was recruiting nominees for the scheme as well," namely, Terence Sykes.[7] We previ-

---

[6] Appellant's Br. 18. As mentioned earlier, it is unclear how Ms. Sykes arrived at the figure of $196,400. *See supra* note 2. Based on the record, it appears that she meant to say $184,400. *See id.* Nevertheless, this discrepancy is irrelevant for purposes of this appeal. *Id.*

[7] R.219 at 14. In her plea agreement, Ms. Sykes admitted several facts indicating that she knew the extent of the criminal scheme in which she was involved as well as what that scheme entailed. In particular, Ms. Sykes admitted that she, "along with [her] codefendants Chauncey Hicks ('Hicks'), Terence Sykes, and Philip Morris ('Morris'), did knowingly devise, and intend to devise, and participate in, and attempt to participate in, a scheme to defraud financial institutions." R.95 at 2. She admitted to learning about this scheme from Terence Sykes and meeting with Hicks "in the presence of Terence Sykes, to discuss [her] involvement in the scheme." *Id.* at 3. She admitted to having knowledge

(continued…)

ously have viewed facts like these as providing ample sup-
port for a finding of reasonable foreseeability. *See Adeniji*,
221 F.3d at 1029–30; *see also Wang*, 707 F.3d at 916.

Our decision in *Adeniji* is particularly illustrative. *Adeniji*
involved a conspiracy by three individuals to defraud the
Motorola Corporation by causing the company to issue five
checks to two different fictitious businesses. Adetoro Adeni-
ji, a clerk in Motorola's accounts payable department, caused
the checks to issue, and Ademola Allismith and Abdul
Adediran each set up one of the two fictitious businesses.
There was no direct evidence in the case that Allismith and
Adediran ever communicated with each other or even knew
of each other's existence. Nevertheless, this court affirmed
the district court's finding that the loss caused by Adediran
was foreseeable to Allismith**.** In making this determination,
the court noted several important facts. First, the court ob-
served that Adediran and Allismith took nearly identical
steps, close in time, to establish mailing addresses and bank

---

(…continued)
that "Terence Sykes and Hicks caused nominees to withdraw money
from the nominee accounts…, knowing that the balances in the nominee
accounts had been inflated by fraudulent means." *Id.* She admitted to
recruiting nominees and coaching at least five nominees to open and
fraudulently inflate thirty-seven bank accounts. She acknowledged that
she "understood that Hicks was going to fraudulently inflate the balance
in the nominee accounts in order to make it appear that more money was
in the accounts than there actually was, and then withdraw money from
the nominee accounts with [those] inflated balances." *Id.* at 4. Finally, she
admitted that she "knew from Terence Sykes and Hicks that the nomi-
nees typically provided the money to Hicks," and that "Hicks or Ter-
ence Sykes on behalf of Hicks then paid [her] approximately $50 to $100
for each nominee." *Id.* at 4–5.

accounts for their respective, fictitious businesses. *Adeniji*, 221 F.3d at 1029. Second, the court acknowledged that Adediran and Allismith each separately coordinated their efforts with Adeniji, the scheme's leader. *Id.* Finally, the court noted that several suspicious bank transactions by the three codefendants made it "plausible to infer" that they were "sharing the proceeds of the checks that Motorola issued to" Adediran's fictitious business. *Id.* at 1028.

The evidence of knowledge and coordination are just as strong in the present case as in *Adeniji*. Ms. Sykes, along with her fellow recruiters, coordinated their efforts with Hicks and took nearly identical steps to defraud their victims. Further, Ms. Sykes's involvement in this scheme was not limited to her relationship with Hicks, the scheme's leader. Rather, she personally knew and worked closely with at least one other recruiter in this scheme, namely Terence Sykes. On these facts, the district court was entitled to conclude that Ms. Sykes reasonably could foresee the total intended fraud loss caused by her codefendants. The district court did not clearly err in holding Ms. Sykes accountable for the total fraud loss caused by her codefendants.

**2.**

Ms. Sykes also contends that the district court erred in concluding that her offense involved the employment of sophisticated means. We review for clear error a district court's finding that an offense involved sophisticated means. *United States v. Green*, 648 F.3d 569, 576 (7th Cir. 2011).

The Sentencing Guidelines provide for a two-level increase in a defendant's offense level if the offense involved

sophisticated        means.        U.S.S.G.        § 2B1.1(b)(10)(C).
"'[S]ophisticated means' means especially complex or espe-
cially intricate offense conduct pertaining to the execution or
concealment of an offense." *Id.* § 2B1.1 cmt. n.9(B). The pur-
pose of the enhancement is to deter "elaborate efforts to
avoid detection." *United States v. Landwer*, 640 F.3d 769, 772
(7th Cir. 2011) (per curiam). Use of fictitious entities to hide
transactions     ordinarily     indicates     sophisticated     means.
U.S.S.G. § 2B1.1 cmt. n.9(B). In cases involving jointly under-
taken criminal activity, the sophisticated means enhance-
ment may apply to a defendant "so long as the use of sophis-
ticated means by [his] other criminal associates was reason-
ably foreseeable to him." *Green*, 648 F.3d at 576.

Ms. Sykes stresses that *she* engaged in no "complex or
especially intricate conduct" in furtherance of her jointly un-
dertaken criminal activity.[8] The enhancement applies, how-
ever, not only to her own conduct, but also to all reasonably
foreseeable sophisticated means employed by her cocon-
spirators. *Id.* Ms. Sykes knew that this scheme required her
coconspirators to create a variety of complex counterfeit
documents for a number of fake corporations. The scheme
involved, moreover, coordinating time-sensitive conduct
among numerous coconspirators. As the Government points
out, it "required deceiving numerous banks and business
bankers, who presumably had a good deal of skill in this ar-
ea."[9] Together, these facts certainly provide ample support
for the district court's finding that Ms. Sykes's offense in-

---

[8]  Appellant's Br. 21.

[9]  Appellee's Br. 32.

volved sophisticated means. *See* U.S.S.G. § 2B1.1 cmt. n.9(B); *see also United States v. Knox*, 624 F.3d 865, 871 (7th Cir. 2010) ("Knox's coordination of various moving parts of the scheme and his ability to fool so many lenders into extending mortgages they otherwise would not have extended also speaks to the scheme's sophistication."); *United States v. Rettenberger*, 344 F.3d 702, 709 (7th Cir. 2003) (noting that "[c]areful execution and coordination [of a criminal venture] over an extended period" supported a finding of sophisticated means). The district court's decision to apply a sophisticated means enhancement was not clearly erroneous.

### 3.

Ms. Sykes also asks that we determine whether the district court properly considered and adequately weighed her family circumstances as a mitigating factor. We review "*de novo* whether a district court followed proper procedures in sentencing, including its consideration of the 18 U.S.C. § 3553(a) factors and any evidence in mitigation." *United States v. Trujillo-Castillon*, 692 F.3d 575, 578 (7th Cir. 2012). We previously have recognized that "[a] defendant's extraordinary family circumstances can constitute a legitimate basis for imposing a below-guidelines sentence." *United States v. Schroeder*, 536 F.3d 746, 755 (7th Cir. 2008). Because Ms. Sykes squarely raised this factor, the district court was required to consider her family circumstances and to "provide an adequate analysis of how much weight, if any, it should command." *Id.* at 756. "Neither *Schroeder* nor any of our other decisions require[ a] district court to give any particular weight to [a defendant's] family circumstances." *United States v. Gary*, 613 F.3d 706, 711 (7th Cir. 2010). Rather,

*Schroeder* only "stands for the proposition that a sentencing court cannot summarily disregard a defendant's potentially meritorious [family circumstances] arguments." *Id.* "[A]s long as a sentencing court considers the [defendant's] arguments made in mitigation, even if implicitly and imprecisely, the sentence imposed will be found reasonable." *United States v. Diekemper*, 604 F.3d 345, 355 (7th Cir. 2010).

Ms. Sykes argues "that the district court did [not] engage in detailed and meaningful consideration of [her] dire family circumstances."[10] In particular, she argues that the district court "never addressed [at] all the heart of [her] plea—that she is the single mother of two, she is the only parent her kids [have] ever known, and there will be no family members to take care of her kids if she is sent to jail for a long period."[11]

In rejecting her argument, the district court said:

> I've also considered the defendant's family circumstances. The Seventh Circuit has stated that when a defendant presents an argument for a lower sentence based on extraordinary family circumstances, the relevant inquiry is the effect of the defendant's absence on her family members [citing *United States v. Schroeder*, 536 F.3d 746 (7th Cir. 2008)].
>
> I have considered the fact that the defendant is a sole caregiver for her children and that

---

[10]  Appellant's Br. 26.

[11]  *Id.* at 25–26.

there may not be another caregiver readily available. While such facts are mitigating facts, they do not offer sufficient justification for the limited sentence proposed by the defendant. Those that commit crimes are not excused simply because they have children. The defendant committed the instant crime knowing that it could mean the separation—future separation from her children and at the time she was pregnant. The defendant has not pointed to sufficient facts to show that her family situation is so extraordinary to warrant a noncustodial sentence.[12]

As this excerpt demonstrates, the district court did not dismiss summarily Ms. Sykes's argument about her family circumstances. Rather, it considered those circumstances and gave sound reasons for concluding why they did not warrant a below-guidelines sentence. We cannot accept Ms. Sykes's characterization that the court's consideration of this issue was "superficial."[13] The court explicitly addressed the circumstances that it considered potentially mitigating. The court's treatment of the issue comports with our case law. *See, e.g., United States v. Castaldi*, 547 F.3d 699, 706–07 (7th Cir. 2008) (holding that a brief explanation of a within-guidelines sentence was sufficient where the court indicated that it had considered the defendant's arguments); *United States v. Poetz*, 582 F.3d 835, 839 (7th Cir. 2009) (affirming the

---

[12] R.219 at 35–36.

[13] Appellant's Br. 25.

defendant's sentence where the district court's sentencing remarks were "peppered with references to [the defendant's] family" and the record as a whole established that the court implicitly considered the defendant's family circumstances arguments). Because the district court meaningfully considered Ms. Sykes's family circumstances arguments, the court's determination was procedurally correct. To the extent that Ms. Sykes submits that her sentence is not substantively reasonable, we must conclude that her argument has no merit. The decision was within the advisory Guidelines and reflected the seriousness of the offense.

## Conclusion

The judgment of the district court is affirmed.

AFFIRMED