In the

# United States Court of Appeals

## For the Seventh Circuit

No. 18-3334

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

HAMZA DRIDI, a/k/a ALEX,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 16-cr-00167 — **William T. Lawrence**, *Judge.*

ARGUED DECEMBER 4, 2019 — DECIDED MARCH 13, 2020

Before MANION, KANNE, and BARRETT, *Circuit Judges.*

KANNE, *Circuit Judge.* From 2012 to 2015, employees of Elite Imports, a car dealership, engaged in a variety of fraudulent activities. For his involvement in these illegal schemes, one employee, Hamza Dridi, was charged with conspiring to violate the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(d), and interstate transportation of stolen property, 18 U.S.C. § 2314. A jury found him guilty of both

crimes. The district court sentenced him to 72 months in prison and ordered $1,811,679.25 in restitution.

Dridi now challenges his sentence and the restitution order, arguing that the district court—before sentencing Dridi and ordering restitution—should have made specific factual findings about Dridi's participation in the conspiracy.

We agree with Dridi that the district court erred both by not making specific factual findings prior to sentencing Dridi and by not adequately demarcating the scheme before imposing $1,811,679.25 in restitution. But because only the second error affected Dridi's substantial rights, we affirm Dridi's prison sentence, vacate the restitution order, and remand the issue of restitution for further proceedings consistent with this opinion.

## I. BACKGROUND

Mahammad Hindi and Mohamed Mahmoud co-owned two car dealerships in Indianapolis: Elite Imports and Elite Car Imports (collectively "Elite Imports"). By 2012, Elite Imports's employees were engaged in a variety of illegal schemes intended to defraud lenders and insurance companies.

### A. Fraudulent Schemes

Before acquiring cars for resale, Elite Imports needed to obtain financing from floor-plan lenders. Floor-plan lenders provide loans to dealerships like Elite, enabling them to buy cars in bulk. In exchange for these loans, a dealership agrees that, shortly after a car is sold, the dealership will pay the floor-plan lender the amount borrowed for that car. To ensure payment, floor-plan lenders hold on to the title of each car, and only release the title to a dealership once the floor-plan

lender receives payment for the car. Floor-plan lenders also send auditors to a dealership's car lot to make sure the dealership is not selling cars without repaying the loan after each sale.

However, Elite Imports's employees found a way around acquiring a car's title from floor-plan lenders: lying. Instead of seeking the original title from the floor-plan lender, an Elite Imports employee would obtain a copy of the car's title from the Indiana Bureau of Motor Vehicles's online portal. If a copy of the title could not be acquired, employees could still avoid asking floor-plan lenders to release the car's title—by continually issuing the customer temporary license plates.

To prevent this scheme from being detected by floor-plan lenders and their auditors, Elite Imports's employees would call customers and request that their cars be returned to the lot for a VIN number inspection or a free oil change. The customers who obliged would return their cars to the lot before an auditor's inspection. If a car could not be returned, employees would simply lie to the auditor, saying that the car was not on the lot due to a test drive or repairs.

In the end, this multi-layered scheme allowed Elite Imports to sell cars without repaying floor-plan lenders.

Elite Imports's employees also defrauded consumer lenders. Sometimes, employees would be approached by customers who could not afford a car without a loan and did not qualify for a consumer loan. To sell cars to these customers, employees helped the customer submit fraudulent applications to consumer lenders. Employees would create fake bank statements, driver's licenses, and social security cards for the customers to send to their lenders. Multiple customers used

these fraudulent documents to obtain financing for a car purchase. When the loan was approved, the lenders paid Elite Imports the price of the vehicle, shifting all risk of loan nonpayment to the consumer lenders, who were often never repaid by the customer.

In a final scheme, Elite Imports's employees used the dealership's resources to defraud insurance companies for their own financial gain. Multiple employees used a chop shop located behind the dealership to disassemble their own vehicles. The employees would then report their vehicles as stolen to law enforcement agencies and insurance companies. Employees even directed customers to file similarly fraudulent insurance claims. The employee or the customer would then receive insurance proceeds on the reportedly stolen car.

*B. Dridi's Involvement*

The parties dispute the exact time Dridi began working for Elite Imports. The government claims Dridi started in late 2012 or early 2013; Dridi claims it was late 2013 but testified at trial that he did not remember the exact date. Although the record does not pin down exactly when Dridi began working there, it does reveal his employment began in or before May 2013: Pam Tatom, Elite Imports's finance manager, testified that Dridi was already working at Elite Imports by the time she started working there in May 2013.

At some point after Dridi began working for Elite Imports, he participated in various aspects of its fraudulent schemes. For example, Dridi opened an insurance policy on a truck in August 2013. A few months later, he reported the truck stolen and collected $1,600.90 in insurance proceeds.

Looking at another example, by late 2014, Elite Imports had promoted Dridi to service manager, a position in the body shop. In this role, Dridi oversaw the disassembly of multiple vehicles that would later be reported stolen. Specifically, Dridi directed an employee to disassemble a red Ducati motorcycle that belonged to another employee, Mahdi Khelefi. Khelefi then reported the motorcycle stolen, received a check for the proceeds, and endorsed that check to Dridi.

Dridi also participated in Elite Imports's other fraudulent activity. In preparation for an audit by floor-plan lenders, Dridi would call customers to request that they return their cars to the lot; then, he would help clean the car so auditors could not tell the car had been sold. Additionally, Tatom would email Dridi documents to be used in defrauding consumer lenders.

*C. Charges, Trial, and Sentencing*

In an eight-count indictment in August 2016, the government charged four Elite Imports employees—Mohamed Mahmoud, Mahdi Khelefi, Issa Kayyali, and Hamza Dridi—for their roles in Elite Imports's fraudulent schemes. Dridi faced two counts: conspiring to violate the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(d), and interstate transportation of stolen property, 18 U.S.C. § 2314. Mahmoud and Kayyali pled guilty; Dridi and Khelefi proceeded to trial.

In a nine-day joint jury trial, the government called nearly sixty witnesses, including Dridi's coconspirators, representatives from defrauded insurance companies and lenders, and former Elite Imports customers. The jury found Dridi guilty of both charged counts.

After Dridi's trial, but before he was sentenced, the district court sentenced Mahmoud, the conspiracy leader. For Mahmoud's sentencing, the court required the government to "prepare and file a chart that lists each victim, the fraud scheme with which that victim is associated, the loss amount for that victim, the restitution amount due to that victim, and the source or sources for the loss and restitution numbers." The government complied and concluded that Elite Imports's fraud schemes caused $1,812,788.19 in total loss.

A few months later, the probation office submitted Dridi's final revised presentence investigation report ("PSR"). Based on the government's loss calculation and updated victim information, the PSR indicated that the offense[1] involved $1,848,868.50 in loss. Using this loss amount, the probation office recommended a sixteen-level increase in Dridi's offense level and a restitution amount of $1,811,679.25. U.S.S.G. § 2B1.1(b)(1)(I).

At Dridi's sentencing hearing, the district court first reviewed restitution and reminded Dridi that he was jointly and severally liable for $1,811,679.25 in total restitution to more than thirty victims. Then the district court calculated Dridi's guideline range to be 78 to 97 months in prison; this range included a sixteen-level enhancement based on a loss amount between $1,500,000 and $3,500,000. U.S.S.G. § 2B1.1(b)(1)(I). Dridi did not object to the restitution amount or the loss calculation. The district court ultimately sentenced Dridi to 72

---

[1] Both counts of conviction involved "substantially the same harm" and were grouped together for guideline calculation purposes. U.S.S.G. § 3D1.2.

months in prison and held him jointly and severally liable for $1,811,679.25 in restitution.

## II. ANALYSIS

Dridi argues that the district court erred in calculating both his guideline range and his restitution amount. The government responds that Dridi waived these arguments because he did not raise them before the district court. So, before reaching the merits of Dridi's arguments, we must first determine whether Dridi waived or merely forfeited his two arguments.

### A. Waiver or Forfeiture

"Waiver is the intentional relinquishment of a known right." *United States v. Butler*, 777 F.3d 382, 387 (7th Cir. 2015). Forfeiture is the accidental or neglectful failure to timely assert a right. *United States v. Jaimes-Jaimes*, 406 F.3d 845, 847–49 (7th Cir. 2005). Waiver precludes appellate review, but forfeiture allows review for plain error. *United States v. Olano*, 507 U.S. 725, 733–34 (1993). The line between waiver and forfeiture, however, is sometimes hard to delineate and can depend on the nature of the right at issue. *United States v. Flores*, 929 F.3d 443, 447 (7th Cir. 2019). We construe waiver principles liberally in favor of the defendant. *United States v. Perry*, 223 F.3d 431, 433 (7th Cir. 2000).

We have found waiver when there are "sound strategic reasons" a defendant would choose to forego an argument before the district court. *Jaimes-Jaimes*, 406 F.3d at 848. But we have found forfeiture when the government cannot proffer a plausible strategic justification for a decision to not object. *United States v. Oliver*, 873 F.3d 601, 607 (7th Cir. 2017).

Here, the government has not convinced us that strategy—as opposed to inadvertence—explains why Dridi's attorney did not object to the increased offense level and restitution amount. The government claims the lack of objections can be attributed to Dridi throwing "himself on the mercy of the court." But a defendant can request lenience and apologize for his behavior and still object to ensure his guideline range and restitution amount are based on the correct conduct.

So, construing waiver principles liberally in Dridi's favor, his attorney's failure to object looks more inadvertent than intentional. We therefore find that Dridi forfeited, rather than waived, his two related arguments on appeal.

*B. Guideline Range*

Dridi argues that the district court erred by not specifically determining which conduct of Dridi's coconspirators could be attributed to him for purposes of sentencing. U.S.S.G. § 1B1.3(a)(1)(B).

Because Dridi forfeited this argument, we review for plain error. Fed. R. Crim. P. 52(b); *Jaimes-Jaimes*, 406 F.3d at 847. We may reverse if: (1) the court made an error that was plain and (2) that error affected the defendant's substantial rights. *United States v. Garvey*, 688 F.3d 881, 884 (7th Cir. 2012). An error is plain when "the law at the time of appellate review shows clearly that [the deviation] was an error." *United States v. Pierson*, 925 F.3d 913, 919 (7th Cir. 2019). "Substantial rights are affected when the defendant can show 'a reasonable probability that, but for the error, the outcome of the proceeding would have been different.'" *United States v. Burns*, 843 F.3d

679, 688 (7th Cir. 2016) (quoting *United States v. Hulburt*, 835 F.3d 715, 725 (7th Cir. 2016)).

In turning to our first question—whether the district court committed an error that is plain—we start with Sentencing Guideline § 2B1.1. Section 2B1.1 explains that the defendant's offense level should be increased based on the amount of loss the defendant caused. Loss is defined as "the greater of" intended loss or actual loss. U.S.S.G. § 2B1.1 cmt. n. 3(A). Actual loss "means the reasonably foreseeable pecuniary harm that resulted from the offense." *Id.* § 2B1.1 cmt. n. 3(A)(i).

This loss calculation includes losses caused by others' actions if those actions were (1) "within the scope of the jointly undertaken criminal activity," (2) "in furtherance of that criminal activity," and (3) "reasonably foreseeable in connection with that criminal activity." U.S.S.G. § 1B1.3(a)(1)(B)(i)–(iii); *see United States v. White*, 883 F.3d 983, 987–88 (7th Cir. 2018). We have required district courts to make independent findings on each of these elements before basing a defendant's sentence in part on loss caused by the entire conspiracy. *See, e.g., United States v. Sykes*, 774 F.3d 1145, 1150 (7th Cir. 2014) (requiring a similar elemental analysis under a prior version of § 1B1.3); *United States v. Aslan*, 644 F.3d 526, 536 (7th Cir. 2011) (same). Other circuits have imposed the same requirement. *See, e.g., United States v. Figueroa-Labrada*, 720 F.3d 1258, 1266–67 (10th Cir. 2013); *United States v. Childress*, 58 F.3d 693, 722 (D.C. Cir. 1995).

The government argues that it is unclear whether a district court must make findings under § 1B1.3 when loss is undisputed. The government leans on our recent statement in *White*: "When the issue of individual responsibility for conduct of others is *contested*, a district court should make a

finding on each element of the relevant conduct test." 883 F.3d at 988 (emphasis added). Unless the defendant contests the loss amount, the government reasons, the error cannot be plain.

We disagree. *White* did not address what a court must do when a defendant does not contest the loss amount. After all, the defendant in *White* objected to the district court's loss calculation. *Id.* Thus, *White* did not disturb the clear law in our circuit: before sentencing a defendant based on the loss caused by the entire conspiracy, the district court must make particularized findings about the scope of conduct attributable to the defendant. The district court here did not make those findings; that error is plain.

Now we must determine whether the error affected Dridi's substantial rights. *See Burns*, 843 F.3d at 688. The district court attributed $1,848,868.50 in loss to Dridi. Under the Guidelines, if the loss was more than $1,500,000, the district court was to add sixteen levels to Dridi's base offense level. *See* U.S.S.G. § 2B1.1(b)(1)(I). But if the loss was $1,500,000 or less, the district court was to add no more than fourteen levels to the base offense. *See id.* at § 2B1.1(b)(1)(H). And, keeping all else the same, had Dridi's offense level dropped at all, his guideline range would have dropped as well. So, because he says his guideline range would have been different, Dridi argues the district court's error requires resentencing. *See Molina-Martinez v. United States*, 136 S. Ct. 1338, 1345 (2016) ("When a defendant is sentenced under an incorrect Guidelines range … the error itself can, and most often will, be sufficient to show a reasonable probability of a different outcome absent the error.").

Thus, to show that Dridi is entitled to resentencing based on a different loss amount, Dridi must demonstrate a reasonable probability that relevant conduct findings under § 1B1.3 would reveal loss attributable to Dridi of $1,500,000 or less. In other words, Dridi must show that—had the district court made specific findings under § 1B1.3—the loss amount would have been $348,868.50 less than the amount the district court attributed to Dridi.

Dridi's argument rests predominantly on the "reasonably foreseeable" requirement of § 1B1.3. Under that requirement, loss may be attributable to Dridi only if the acts producing the loss were "reasonably foreseeable" to him. *See Sykes*, 774 F.3d at 1150–51. He argues that he couldn't have foreseen coconspirators' acts before he joined the conspiracy—which he says happened in late 2014; and at least $139,308.67 of the conspiracy's loss came from acts that happened *before* October 2014. Dridi also argues, relying on new information provided by the government,[2] that only $1,377,305.10 in losses occurred *after* he joined the conspiracy in late 2014. So, Dridi reasons that a § 1B1.3 factual finding would show that no more than $1,500,000 in loss can be attributed to him, resulting in a lower guideline range.

But the record is not as clear as Dridi suggests. While Dridi claims he started working for Elite Imports in late 2013, Pam Tatom testified that Dridi was already working there by May 2013. Dridi also claims that he did not join *any* part of the

---

[2] The government filed a motion with the district court to supplement the record on appeal with the documents underlying its loss calculation. Dridi did not oppose this motion, and the district court added the proposed documents to the record.

conspiracy until late 2014, yet Dridi filed a fraudulent insurance claim on his truck in late 2013. The record also shows that, during an undefined time period, Dridi helped defraud floor-plan lenders by asking customers to return their vehicles to the lot, and he participated in Elite Imports's scheme to defraud consumer lenders.

So, the record does not uncover exactly when Dridi began participating in Elite Imports's fraudulent schemes. Accordingly, the record does not confirm which of Dridi's coconspirators' actions were "within the scope of," "in furtherance of," and "reasonably foreseeable in connection with" the jointly undertaken criminal activity in which Dridi took part. U.S.S.G. § 1B1.3.

But we are sure that the record contradicts Dridi's assertion—on which he builds his argument—that he did not join any part of the conspiracy until late 2014. Dridi therefore did not demonstrate, based on the record, a reasonable probability that, but for the district court's failure to make § 1B1.3 findings, the outcome of his sentencing hearing would have been different. So, the district court's error in foregoing findings under § 1B1.3 did not affect Dridi's substantial rights.

*C. Restitution Amount*

Finally, Dridi argues the district court erred by not "mak[ing] findings on the scope of the scheme" before imposing restitution. As with Dridi's first argument, Dridi failed to object with this contention during his sentencing hearing. So, we review his restitution argument for plain error.

"The restitution issue is similar but not identical to the loss amount issue." *White*, 883 F.3d at 992. The Mandatory Victim Restitution Act, which authorizes restitution in this case,

applies to "a victim's losses from the offense of conviction, which is *narrower* than relevant conduct under the Guidelines." *Id.* (emphasis added). Restitution is thus limited to the "actual losses caused by the specific conduct underlying the offense" and the government must "establish [actual loss] by a preponderance of the evidence." *United States v. Orillo*, 733 F.3d 241, 244 (7th Cir. 2013).

When calculating a defendant's restitution amount, district courts should "adequately demarcate the scheme" by explaining the scheme's scope. *United States v. Smith*, 218 F.3d 777, 784 (7th Cir. 2000). This process necessarily requires the district court to explain how the defendant is responsible for the amount of restitution ordered. *See White*, 883 F.3d at 992.

Here, the district court did not adequately demarcate the scheme. Instead, it accepted the loss amounts set forth in the PSR without explaining how and when the loss occurred and whether Dridi was responsible for it. For example, the restitution recommendation in the PSR—which the district court fully accepted—includes $11,428.00 representing the remaining loan amount of a victim who purchased a car from Elite Imports in May 2012. Importantly, this victim's loss occurred in mid-2012. And based on the evidence in the record, we cannot assume that Dridi worked at Elite Imports during this time. So, the lack of factual findings on how Dridi is responsible for this restitution amount is a plain error.

This error affected Dridi's substantial rights: he was "required to pay more in restitution than he owes." *Burns*, 843 F.3d at 689; *see White*, 883 F.3d at 992 ("[W]e must remand because the evidence actually contradicts the restitution award."). The district court ordered $1,811,679.25 in restitution—the full amount recommended in the PSR. But as

discussed above, the evidence does not support holding Dridi liable for this entire amount. Therefore, the district court ordered restitution beyond what the record indicates Dridi caused; this warrants reconsideration of the entire restitution award. *See Burns*, 843 F.3d at 690. In redetermining the restitution award on remand, the court should demarcate the scheme and establish the actual amount of loss caused by Dridi's conduct.

## III. CONCLUSION

The district court's errors at sentencing affected only Dridi's restitution amount, not his guideline range. We therefore AFFIRM his sentence, VACATE the restitution order, and REMAND the issue of restitution for proceedings consistent with this opinion.